# EXHIBIT 4

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )          CDC Number E-70748
                          )
MICHAEL SIMMONS           )
                          )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

APRIL 5, 2006


PANEL PRESENT:

JAMES DAVIS, Presiding Commissioner
DENNIS SMITH, Deputy Commissioner

OTHERS PRESENT:

MICHAEL SIMMONS, Inmate
MARY ANN TARDIFF, Attorney for Inmate
HAROLD WILSON, Deputy District Attorney
LARRY MILLS, Victim's Next of Kin, Observer
TINA MILLS, Victim's Next of Kin
MICHAEL SIMMONS, Victim's Next of Kin
MICHELLE BATARA, Victim Services, Observer
TWO CORRECTIONAL OFFICERS, Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum


**Ramona Cota**            **Peters Shorthand Reporting**

ii

## INDEX

|                          | PAGE |
|--------------------------|------|
| Proceedings              | 1    |
| Case Factors             | 9    |
| Pre-Commitment Factors   | 18   |
| Post-Commitment Factors  | 25   |
| Parole Plans             | 31   |
| Closing Statements       | 42   |
| Recess                   | 53   |
| Decision                 | 54   |
| Adjournment              | 57   |
| Transcriber Certification| 58   |

--oOo--

1

1     P R O C E E D I N G S

2          DEPUTY COMMISSIONER SMITH:  We're on the

3     record.

4          PRESIDING COMMISSIONER DAVIS:  This is a

5     Subsequent Parole Consideration Hearing for

6     Michael Simmons, CDC number E-70748.  Today's

7     date is April 5, 2006, we are located at the

8     Correctional Training Facility, Soledad.  The

9     inmate was received on September 27, 1990 from

10    San Bernardino County.  The life term began on

11    November 30, 1991 with a minimum eligible parole

12    date of November 29, 2001.  The controlling

13    offense for which the inmate has been committed

14    is murder in the second degree, case number

15    VCR4656, count one, Penal Code Section 187,

16    second, with 12022.5, an armed allegation.  The

17    inmate received a term of 17 years to life.

18    This hearing is being tape-recorded and for the

19    purposes of voice identification we'll each

20    state our name, first and last name, spelling

21    the last name.  When it comes to you, sir, if

22    you would also give us your CDC number.  I'll

23    start and move to my left.  My name is James

24    Davis, D-A-V-I-S, Commissioner.

25          DEPUTY COMMISSIONER SMITH:  My name is

26    Dennis Smith, S-M-I-T-H.  I'm a Deputy

27    Commissioner.

1          **MR. SIMMONS:**  I'm Michael Simmons, S-I-M-

2  M-O-N-S.  I'm the son of Michael.

3          **MS. MILLS:**  My name is Tina Mills, M-I-L-

4  L-S.  I'm Corina's (phonetic) mother.

5          **PRESIDING COMMISSIONER DAVIS:**  We'll go

6  back to the gentleman in the back also, please.

7          **MR. MILLS:**  My name is Larry Mills, I'm

8  Corina's father.

9          **PRESIDING COMMISSIONER DAVIS:**  Spell your

10  last name for me please, sir.

11          **MR. MILLS:**  M-I-L-L-S.

12          **PRESIDING COMMISSIONER DAVIS:**  Thank you.

13          **DEPUTY DISTRICT ATTORNEY WILSON:**  Harold

14  Wilson, W-I-L-S-O-N, Deputy District Attorney

15  San Bernardino County.

16          **MS. BATARA:**  Michelle Batara, B-A-T-A-R-

17  A, Victim Services.

18          **ATTORNEY TARDIFF:**  Mary Ann Tardiff, T-A-

19  R-D-I-F-F, attorney for Mr. Simmons.

20          **INMATE SIMMONS:**  Michael Anthony Simmons,

21  S-I-M-M-O-N-S, E-70748.

22          **PRESIDING COMMISSIONER DAVIS:**  Thank you.

23  And let the record also reflect that there are

24  two correctional officers in the room with us

25  today.  They were here for security purposes

26  only and will not be asked to participate in the

27  hearing.  Mr. Simmons, in front of you on a

3

1   laminated sheet you'll notice a piece of paper.
2   Would you please read that aloud, sir.
3           **INMATE SIMMONS:**
4           "ADA, the Americans with
5           Disabilities Act.  The Americans
6           with Disabilities Act, ADA, is a
7           law to help people with
8           disabilities.  Disabilities are
9           problems that make it harder for
10          some people to see, hear, breathe,
11          talk, walk, learn, think, work or
12          take care of themselves than it is
13          for others.  Nobody can be kept
14          out of public places or activities
15          because of a disability.  If you
16          have a disability you have the
17          right to ask for help to get ready
18          for the BPT Hearing, to get the
19          hearing, talk, read forms and
20          papers and understand the hearing
21          process.  BPT will look at what
22          you ask for to make sure that you
23          have a disability that is covered
24          by the ADA and that you have asked
25          for the right kind of help.  And
26          if you do not get help or if you
27          don't think you got the kind of

4

1           help you need, ask for the BPT

2           1074 Grievance Form.  You can also

3           get help to fill it out."

4           **PRESIDING COMMISSIONER DAVIS**:  Thank you.

5   Now, Mr. Simmons, our records indicate that on

6   5/23/05 you signed one of the forms from the

7   BPT, form number 1073, that indicates that you

8   do not have any disabilities that would be

9   covered under the Americans with Disabilities

10  Act.  Is that true, sir?

11          **INMATE SIMMONS**:  That's true.

12          **PRESIDING COMMISSIONER DAVIS**:  All right.

13  You were able to read that today without

14  glasses.

15          **INMATE SIMMONS**:  Without glasses.

16          **PRESIDING COMMISSIONER DAVIS**:  And do you

17  normally wear glasses at all?

18          **INMATE SIMMONS**:  No sir.

19          **PRESIDING COMMISSIONER DAVIS**:  Okay, so

20  you're fine without.  You're able to hear me

21  well?

22          **INMATE SIMMONS**:  Yes sir.

23          **PRESIDING COMMISSIONER DAVIS**:  No

24  problems with your hearing.  You made it here

25  under your own, under your own steam?

26          **INMATE SIMMONS**:  Yes sir.

27          **PRESIDING COMMISSIONER DAVIS**:  All right.

5

1  Are there any problems whatsoever that you know

2  of, sir, that would preclude you from actively

3  participating in this hearing?

4        **INMATE SIMMONS:**  No sir.

5        **PRESIDING COMMISSIONER DAVIS:**  Counsel,

6  are you satisfied that your client is able to

7  actively participate in the hearing?

8        **ATTORNEY TARDIFF:**  I am.

9        **PRESIDING COMMISSIONER DAVIS:**  Thank you.

10 This hearing is being conducted pursuant to

11 Penal Code Sections 3041 and 3042 and the rules

12 and regulations of the Board of Prison Terms

13 governing parole consideration hearings for life

14 inmates.  The purpose of the today's hearing is

15 to once again consider the number and nature of

16 the crimes for which you were committed, your

17 prior criminal and social history and your

18 behavior and programming since your commitment.

19 We have had the opportunity to review your

20 Central File and your prior transcripts and you

21 will be given the opportunity to correct or

22 clarify the record as we proceed.  We will reach

23 a decision today and inform you of whether or

24 not we find you suitable for parole and the

25 reasons for that decision.  If you are found

26 suitable for parole the length of your

27 confinement will be explained to you.  Nothing

1    that happens today will change the findings of

2    the court.  The panel is not here to retry the

3    case.  The panel is here for the sole purpose of

4    determining your suitability for parole.  Do you

5    understand that, sir?

6         **INMATE SIMMONS:**  Yes sir.

7         **PRESIDING COMMISSIONER DAVIS:**  And just

8    as before the hearing will be conducted in two

9    phases.  I will be discussing with you the crime

10   for which you were committed for, your prior

11   criminal history and your social history.

12   Commissioner Smith will be talking about your

13   progress since your incarceration, your

14   counselor's report, your psychological

15   evaluation, your parole plans and any letters of

16   support or opposition as they may exist.  Once

17   that is concluded the Commissioners, the

18   district attorney and your attorney will be

19   given the opportunity to ask you questions.  The

20   questions from the district attorney will be

21   asked through the Chair and they will be

22   directed to you to answer and then you will

23   respond to the panel.  Next the district

24   attorney, then your attorney, then you will be

25   given an opportunity to make a final statement

26   regarding your suitability.  Your statement

27   should address specifically why you are suitable

1  for parole.  The victim's next of kin then will

2  be the final people to speak and that will be

3  you all.  You will be given an opportunity to

4  speak at the very end.  The panel will then

5  recess and clear the room for deliberation.  The

6  California Code of Regulations states that

7  regardless of time served a life inmate shall be

8  found unsuitable for and denied parole if in the

9  judgment of the panel the inmate would pose an

10  unreasonable risk of danger to society if

11  released from prison.  You have certain rights.

12  Those rights include the right to a timely

13  notice of the hearing, the right to review your

14  Central File and the right to present relevant

15  documents.  Counsel, are there any additional

16  documents that we'll be considering today?

17        **ATTORNEY TARDIFF:**  None other than I have

18  already presented.

19        **PRESIDING COMMISSIONER DAVIS:**  All right,

20  thank you.  You have an additional right, sir,

21  to be heard by an impartial panel.  You have

22  heard Commissioner Smith and I introduced today.

23  Do you have any reason to believe that

24  Commissioner Smith and I would not be impartial?

25        **INMATE SIMMONS:**  No.

26        **PRESIDING COMMISSIONER DAVIS:**  Thank you.

27  You will receive a written copy of our tentative

8

 1   decision today.   That decision becomes effective

 2   within 120 days.   A copy of the decision and a

 3   copy of the transcript will be sent to you and

 4   you will have 90 days from that date to appeal

 5   if you so desire.   You are not required to admit

 6   your offense or discuss your offense.   However,

 7   this panel does accept the findings of the court

 8   to be true.   Do you understand that, sir?

 9          **INMATE SIMMONS:**   Yes sir.

10          **PRESIDING COMMISSIONER DAVIS:**   The Board

11   has eliminated its appeal process.   If you

12   disagree with anything in today's hearing you

13   have the right to go directly to the court with

14   your complaint.   Commissioner Smith, will we be

15   dealing with any confidential material today?

16          **DEPUTY COMMISSIONER SMITH:**   There is

17   confidential information in the C File but we'll

18   not be using it this afternoon.

19          **PRESIDING COMMISSIONER DAVIS:**   Very well.

20   I am passing a list of documents to the

21   counsels.   If they would look at that and make

22   sure that we are operating on the same set of

23   documents today.

24          **DEPUTY DISTRICT ATTORNEY WILSON:**

25   Commissioner I have those documents?

26          **PRESIDING COMMISSIONER DAVIS:**   Thank you.

27          **ATTORNEY TARDIFF:**   And I believe we also

9

1  have all the Board reports so I'll mark that

2  off.  And I have the documents, thank you.

3      **PRESIDING COMMISSIONER DAVIS:**  Thank you.

4  Counsel, are there any preliminary objections

5  that we need to deal with today?

6      **ATTORNEY TARDIFF:**  No.

7      **PRESIDING COMMISSIONER DAVIS:**  Will your

8  client be speaking with us?

9      **ATTORNEY TARDIFF:**  Yes.

10      **PRESIDING COMMISSIONER DAVIS:**

11  Mr. Simmons, would you raise your right hand

12  please, sir.  Do you solemnly swear that the

13  testimony you give to this panel today will be

14  the truth and nothing but the truth?

15      **INMATE SIMMONS:**  Yes sir.

16      **PRESIDING COMMISSIONER DAVIS:**  All right.

17  I'm going to incorporate by reference the

18  statements of fact from the Court of Appeals

19  document dated 4/20/92, pages two through four,

20  unless you have any objections, counsel?

21      **ATTORNEY TARDIFF:**  I have no objection.

22      **PRESIDING COMMISSIONER DAVIS:**  Thank you.

23  Mr. Simmons, as I understand it from reading

24  through all of the information, that you and the

25  victim argued on the Friday prior to her death

26  over the fact that you did not go to work on

27  Friday because your car wasn't running and she

10

1    had discovered a mirror with some cocaine

2    residue on it.

3          INMATE SIMMONS:  It was speed, sir.

4          PRESIDING COMMISSIONER DAVIS:  It was

5    speed, methamphetamine?

6          INMATE SIMMONS:  It was speed,

7    methamphetamine.  Yes, it was.

8          PRESIDING COMMISSIONER DAVIS:  On

9    Saturday you were still trying to repair your

10   car with the help of your neighbor, a Chris --

11   Is it Cothren?

12         INMATE SIMMONS:  Cothren.

13         PRESIDING COMMISSIONER DAVIS:  C-O-T-H-R-

14   E-N.  There was another argument over the time

15   that you were not spending with the victim and

16   the children.

17         INMATE SIMMONS:  Yes sir.

18         PRESIDING COMMISSIONER DAVIS:  And it was

19   during that argument that your children went

20   next door and got Mr. Cothren.

21         INMATE SIMMONS:  Yes sir.

22         PRESIDING COMMISSIONER DAVIS:  He came

23   over to your home.

24         INMATE SIMMONS:  Yes sir.

25         PRESIDING COMMISSIONER DAVIS:  Is that

26   right?

27         INMATE SIMMONS:  Yes sir.

11

1          **PRESIDING COMMISSIONER DAVIS:**  When he

2     tried to intercede in this argument that you and

3     the victim were having she threw something at

4     him and he backed off.  Shortly thereafter he

5     heard a loud bang coming from the garage.  He

6     went out into the garage, saw the victim on the

7     ground and you with a gun in your hand.

8          **INMATE SIMMONS:**  Yes sir.

9          **PRESIDING COMMISSIONER DAVIS:**  And then

10    he kicked the gun out of your hand.

11         **INMATE SIMMONS:**  Well I don't know about

12    that.  All I know was that the gun was out of my

13    hand.  I don't remember after the gun went off

14    what happened.

15         **PRESIDING COMMISSIONER DAVIS:**  Okay, well

16    the record indicates that he kicked it out of

17    your hand.

18         **INMATE SIMMONS:**  Yeah, I know.

19         **PRESIDING COMMISSIONER DAVIS:**  Somehow or

20    another it got out of your hand.

21         **INMATE SIMMONS:**  Yes sir.

22         **PRESIDING COMMISSIONER DAVIS:**  Did you

23    commit this crime sir?

24         **INMATE SIMMONS:**  Yes sir.

25         **PRESIDING COMMISSIONER DAVIS:**  Tell me

26    your version of this.  What happened that day

27    the best that you remember.

12

1          **INMATE SIMMONS:**  We were arguing.  We

2     kept arguing back and forth.  Corina was going

3     in and destroying all this stuff.  Taking it and

4     throwing it down.  And I was trying to, I was

5     avoiding her, staying away from her.  I'd be

6     hiding and she'd go take everything and knock it

7     down.  And I'd go hide from her and clean it up

8     afterwards.  And then when she was in the garage

9     I slapped her in the back of the head one time

10    and then she went in the kitchen and started

11    crying.  And that's when Scott went in there.

12    And Scott tried to talk to her.  And she struck

13    at, she went to strike at him.  And I was

14    sitting in the living room at that time.  So I

15    didn't see it.  He come in the living room and

16    telling me that she just struck at him.  And she

17    called me into the garage.  There was a gun

18    loaded in the garage in the drawer.  So she was

19    hollering and screaming at me for having a gun

20    loaded in the garage because the kids could have

21    got it to it.  And one of them could have got

22    injured from it.  And I went try to unload the

23    firearm.  During that time we were arguing.  She

24    went to strike at me.  I went to block.  The gun

25    went off.

26         **PRESIDING COMMISSIONER DAVIS:**  That seems

27    to be one of the major bones of contention is

13

1  how this weapon went off.  You had other

2  firearms in the house?

3          **INMATE SIMMONS:**  Yes sir.

4          **PRESIDING COMMISSIONER DAVIS:**  And you

5  had a lot of experience with firearms?

6          **INMATE SIMMONS:**  Well with, not this

7  particular one, I just only had it a couple of

8  days.  But I had rifles.  Not this particular,

9  it was a pistol, an old pistol, single action.

10  And I didn't, I wasn't too familiar with this

11  weapon.

12          **PRESIDING COMMISSIONER DAVIS:**  Single

13  action 44 caliber.

14          **INMATE SIMMONS:**  Yes sir.

15          **PRESIDING COMMISSIONER DAVIS:**  And you

16  say it was an old gun?  How old a gun was it?

17          **INMATE SIMMONS:**  I know it was just an

18  older gun.  It was single action.  For me it's

19  an older gun.  It's an old western-type gun.

20  And you had to pull the hammer back to unload

21  it.  And I wasn't paying attention --

22          **PRESIDING COMMISSIONER DAVIS:**  Had you

23  ever taken any sort of firearm classes of any

24  kind?

25          **INMATE SIMMONS:**  No sir.

26          **PRESIDING COMMISSIONER DAVIS:**  And you

27  had had this gun for how long?

14

1        **INMATE SIMMONS:**  About maybe three days.

2        **PRESIDING COMMISSIONER DAVIS:**  Three

3   days.  How did you come to own this gun?

4        **INMATE SIMMONS:**  A friend of mine gave it

5   to me.

6        **PRESIDING COMMISSIONER DAVIS:**  So it was

7   a gift.  You didn't buy it through the normal

8   channels or anything like that.  Had you gone

9   out and fired the gun?

10       **INMATE SIMMONS:**  One time.

11       **PRESIDING COMMISSIONER DAVIS:**  Now during

12  testimony in the court of appeals document that

13  was entered into the record by reference, it

14  talks about someone who gave testimony about

15  that the weapon that was involved in this.  And

16  they say, a single action weapon must be fired,

17  must be cocked before firing.  The weapon has

18  four hammer positions.  The third position is

19  the loading position, the fourth is the firing.

20  The weapon cannot be fired from the hammer

21  loading position nor can it loaded from the

22  hammer firing position.  So to a person reading

23  this and some familiarity with firearms the

24  weapon would have to been cocked and ready to go

25  to shoot.

26       **INMATE SIMMONS:**  Yes sir but I was trying

27  to unload it.  And when I cocked it I wasn't

15

1   paying attention during the time of the

2   argument.  I pulled it back too far.

3        PRESIDING COMMISSIONER DAVIS:  And so you

4   think in trying to unload it that you pulled the

5   hammer all the way back?

6        INMATE SIMMONS:  Yes sir.

7        PRESIDING COMMISSIONER DAVIS:  And then

8   you struck the victim with the gun handle?

9        INMATE SIMMONS:  Yeah, I went to block

10  the blow and that's when the gun went off.

11       PRESIDING COMMISSIONER DAVIS:  Now, you

12  and the victim were not married.

13       INMATE SIMMONS:  No sir.

14       PRESIDING COMMISSIONER DAVIS:  But you

15  had been living together for some time and had

16  two children?

17       INMATE SIMMONS:  Yes sir.

18       PRESIDING COMMISSIONER DAVIS:  Two

19  children together.

20       INMATE SIMMONS:  One is my, well she's

21  not my blood but I raised her.

22       PRESIDING COMMISSIONER DAVIS:  Okay.

23       INMATE SIMMONS:  She's my daughter.

24       PRESIDING COMMISSIONER DAVIS:  Because

25  you were together for some time.

26       INMATE SIMMONS:  Yes sir.

27       PRESIDING COMMISSIONER DAVIS:  Had these

1    arguments, which appear to be very volatile in

2    reading the record, this was not just a spat

3    over something, these were volatile arguments.

4              INMATE SIMMONS:  Yes sir.

5         PRESIDING COMMISSIONER DAVIS:  These had

6    been going on for some time?

7              INMATE SIMMONS:  Yes sir.

8         PRESIDING COMMISSIONER DAVIS:  Had the

9    two of you sought any counseling?

10             INMATE SIMMONS:  No sir.

11        PRESIDING COMMISSIONER DAVIS:  Did you

12   think about going to counseling?

13             INMATE SIMMONS:  No sir.

14        PRESIDING COMMISSIONER DAVIS:  And why

15   not?

16             INMATE SIMMONS:  I guess we weren't even

17   thinking about that at the time, that we needed

18   that.  We were young.  We didn't think that we

19   needed counseling.  We thought we could deal

20   with the problem together, get it situated then.

21        PRESIDING COMMISSIONER DAVIS:  Had the

22   police ever been called prior to this on any of

23   your arguments or fights.

24             INMATE SIMMONS:  No sir.  No sir.

25        PRESIDING COMMISSIONER DAVIS:  Had there

26   been any allegations of abuse, either you

27   against her or her against you?

17

1          **INMATE SIMMONS:**  No sir.

2          **PRESIDING COMMISSIONER DAVIS:**  So there

3    was nothing else prior to this day?

4          **INMATE SIMMONS:**  No sir.

5          **PRESIDING COMMISSIONER DAVIS:**  Had you,

6    so you hadn't thought about even, had there been

7    any split up anytime in the interim?

8          **INMATE SIMMONS:**  Yes sir.

9          **PRESIDING COMMISSIONER DAVIS:**  And when

10    was that?

11          **INMATE SIMMONS:**  A month before we split

12    up.  We got into an argument so we split up.

13    Only it was only for, what, a day, two days.

14          **PRESIDING COMMISSIONER DAVIS:**  Okay.

15          **INMATE SIMMONS:**  But we settled it.

16          **PRESIDING COMMISSIONER DAVIS:**  So when

17    you split up what did, did you leave the house?

18          **INMATE SIMMONS:**  Yes sir.

19          **PRESIDING COMMISSIONER DAVIS:**  And how

20    did you get back together?

21          **INMATE SIMMONS:**  Well she just called me

22    and told me to come back home.  We had, they

23    were having problems.  Somebody tried to break

24    in the house when I wasn't there.  And that's

25    when she called me.  She told me to come home.

26    They were having problems with someone trying to

27    break in.

18

1        **PRESIDING COMMISSIONER DAVIS:**  Were you

2    ever in fear that she was going to harm you?

3        **INMATE SIMMONS:**  No sir.

4        **PRESIDING COMMISSIONER DAVIS:**  In terms

5    of your criminal record, you have no juvenile

6    record.  You had as an adult a conviction for

7    carrying a loaded firearm, three years probation

8    and a suspended sentence and a fine, correct?

9        **INMATE SIMMONS:**  Yes sir.

10        **PRESIDING COMMISSIONER DAVIS:**  What kind

11    of a firearm was it?

12        **INMATE SIMMONS:**  It was a shotgun.

13        **PRESIDING COMMISSIONER DAVIS:**  And it was

14    loaded.  What were you doing with a loaded

15    shotgun?

16        **INMATE SIMMONS:**  I was out in the middle

17    of the desert.  We were target shooting and a

18    helicopter came hovering above us and I put it

19    on the seat.  And it was hovering above us and

20    that's when it got me for the firearm.  I didn't

21    unload it.

22        **PRESIDING COMMISSIONER DAVIS:**  And you

23    have no other criminal record other than that?

24        **INMATE SIMMONS:**  No sir.

25        **PRESIDING COMMISSIONER DAVIS:**  In the

26    psychological report it talks about, inmate

27    Simmons has acknowledged a history of drug abuse

19

1    and, let's see, a history of abuse of drugs and

2    alcohol.  But then looking at the parole

3    officer's report it indicates that you've denied

4    the use of drugs and only an occasional use.

5        INMATE SIMMONS:  Yeah but I've used drugs

6    occasionally and then I went on my spat.  I

7    ain't denying it.  I had a drug problem.

8        PRESIDING COMMISSIONER DAVIS:  How much a

9    part of your life at that time was, well let's

10   start with alcohol, was alcohol?

11       INMATE SIMMONS:  Alcohol wasn't a big

12   part of it, it was the meth.

13       PRESIDING COMMISSIONER DAVIS:  And so how

14   much did you drink?

15       INMATE SIMMONS:  Maybe once on the

16   weekend.  It was the meth that I had the

17   problems with.

18       PRESIDING COMMISSIONER DAVIS:  Well tell

19   me about the methamphetamine use.

20       INMATE SIMMONS:  Well, I was doing it for

21   a while almost every day.

22       PRESIDING COMMISSIONER DAVIS:  Once a

23   day?

24       INMATE SIMMONS:  No, numerous times a

25   day.

26       PRESIDING COMMISSIONER DAVIS:  And when

27   you say you were doing it for a while.  What is

20

1   a while?

2          INMATE SIMMONS:  About a month.

3          PRESIDING COMMISSIONER DAVIS:  So for

4   about a month you were using --

5          INMATE SIMMONS:  Not everyday, yeah, for

6   about a month but not everyday.

7          PRESIDING COMMISSIONER DAVIS:  Were you

8   always snorting it?

9          INMATE SIMMONS:  Yes sir.

10         PRESIDING COMMISSIONER DAVIS:  Did you

11  ever inject it in your veins?

12         INMATE SIMMONS:  No sir.

13         PRESIDING COMMISSIONER DAVIS:  So you

14  were always snorting it.

15         INMATE SIMMONS:  Snorted it.

16         PRESIDING COMMISSIONER DAVIS:  Okay, how

17  did you support your drug habit?

18         INMATE SIMMONS:  I just would work.  I

19  saved a little bit of money and then I worked on

20  radios sometimes, CB radios.  Do a little work

21  here, trade for CB radios.

22         PRESIDING COMMISSIONER DAVIS:  On the day

23  of the offense had you snorted any

24  methamphetamine on that day?

25         INMATE SIMMONS:  No, the night before I

26  did.

27         PRESIDING COMMISSIONER DAVIS:  The night

21

1   before?

2       INMATE SIMMONS:  Yes sir.

3       PRESIDING COMMISSIONER DAVIS:  About what

4   time?

5       INMATE SIMMONS:  I'm not sure, about nine

6   o'clock at night.

7       PRESIDING COMMISSIONER DAVIS:  Did you

8   sleep that night?

9       INMATE SIMMONS:  Yes.

10      PRESIDING COMMISSIONER DAVIS:  For how

11  long?

12      INMATE SIMMONS:  Until early in the

13  morning, about six o'clock in the morning.

14      PRESIDING COMMISSIONER DAVIS:  So you

15  started methamphetamine about nine p.m.?

16      INMATE SIMMONS:  Yes.

17      PRESIDING COMMISSIONER DAVIS:  And then

18  you went to sleep?

19      INMATE SIMMONS:  Yeah, well I only did a

20  line.  I just went to sleep.  I fell asleep in

21  the hallway at the time.  And that's when she

22  woke me up early in the morning because somebody

23  came in the door early in the morning.  She got

24  mad because somebody was at the door.

25      PRESIDING COMMISSIONER DAVIS:  Okay.  Did

26  you do any methamphetamine on that Saturday?

27      INMATE SIMMONS:  That same day, no.

22

1      **PRESIDING COMMISSIONER DAVIS:** No. Okay,

2  we'll ask you to turn your attention now to

3  Commissioner Smith.

4      **DEPUTY COMMISSIONER SMITH:** Mr. Simmons

5  before I go to your adjustment I've got a couple

6  of questions about the commitment offense. Do

7  you recall roughly how tall the victim was?

8      **INMATE SIMMONS:** She's about 5'1".

9      **DEPUTY COMMISSIONER SMITH:** She's about

10  5'1".

11      **INMATE SIMMONS:** Yes about 5'1".

12      **DEPUTY COMMISSIONER SMITH:** Okay. And

13  you said that when you learned that the gun was

14  loaded that you were in a position of trying to

15  unload it?

16      **INMATE SIMMONS:** Yes sir.

17      **PRESIDING COMMISSIONER DAVIS:** Okay. So

18  you were kind of holding the gun in both hands?

19  I'm trying to get a general picture --

20      **INMATE SIMMONS:** Well I had it in one

21  hand and I was trying to push the little lever

22  off it. Because I'm right-handed and so I tried

23  to push the little lever. I had the little door

24  open. I was trying to suspend the thing.

25      **DEPUTY COMMISSIONER SMITH:** Okay, so you

26  got the gun in your right hand.

27      **INMATE SIMMONS:** In my right hand.

23

1        **PRESIDING COMMISSIONER DAVIS:** And you're

2  holding it like your arm is kind of at a 45

3  degree angle.

4        **INMATE SIMMONS:** Yes sir.

5        **DEPUTY COMMISSIONER SMITH:** Okay, and

6  you're trying to unload it.

7        **INMATE SIMMONS:** Yes sir.

8        **DEPUTY COMMISSIONER SMITH:** Okay, and

9  then she struck at you?

10       **INMATE SIMMONS:** Yes sir, (inaudible)

11  strike.

12       **DEPUTY COMMISSIONER SMITH:** Okay.

13       **INMATE SIMMONS:** And I went to block her

14  when she struck.

15       **DEPUTY COMMISSIONER SMITH:** When she

16  struck at you how close was she to you?

17       **INMATE SIMMONS:** I'm not sure.

18       **DEPUTY COMMISSIONER SMITH:** Was she --

19       **INMATE SIMMONS:** It was close.

20       **DEPUTY COMMISSIONER SMITH:** A foot, two

21  feet?

22       **INMATE SIMMONS:** No maybe about a foot.

23       **DEPUTY COMMISSIONER SMITH:** Okay. So she

24  struck and so you took the hand that had the gun

25  in it and blocked?

26       **INMATE SIMMONS:** Yes sir.

27       **DEPUTY COMMISSIONER SMITH:** And it went

24

1  off.

2          INMATE SIMMONS:  Yes sir.

3          DEPUTY COMMISSIONER SMITH:  The coroner's

4  report indicates that the gun was fired from a

5  distance of four to eight inches.  That it

6  passed through the victim's brain on almost a

7  straight-line trajectory.  Okay, do you know

8  what that means?  Do you know what that means?

9          INMATE SIMMONS:  No, what's it mean?

10         DEPUTY COMMISSIONER SMITH:  What it means

11  is if you look at this pencil and the angle of

12  this pencil.

13         INMATE SIMMONS:  Uh-huh.

14         DEPUTY COMMISSIONER SMITH:  As it's going

15  from me to you, that's a straight-line

16  trajectory.  Now if you're ten inches taller

17  than the victim --

18         INMATE SIMMONS:  Uh-huh.

19         DEPUTY COMMISSIONER SMITH:  -- and she

20  swings up at you.  You take your gun and block

21  that shot, that gun is going to be at least ten

22  inches above the top of her head.

23         INMATE SIMMONS:  That's exactly what

24  happened.

25         DEPUTY COMMISSIONER SMITH:  So what I'm

26  reading in the coroner's report and what you're

27  telling me is physically impossible.

1      **INMATE SIMMONS:**  I don't know exactly how

2  far I was away but I figured a foot.  I'm not

3  exact, I don't recall how far away it was.

4      **DEPUTY COMMISSIONER SMITH:**  But the point

5  is that if you're ten inches taller than she

6  is --

7      **ATTORNEY TARDIFF:**  He's not saying how

8  far, he's saying --

9      **DEPUTY COMMISSIONER SMITH:**  And you swing

10  to block and the gun goes off accidentally then

11  it can't be in a straight trajectory and hit

12  her.

13      **INMATE SIMMONS:**  That's the way it

14  happened, I swear.

15      **DEPUTY COMMISSIONER SMITH:**  Okay.

16      **INMATE SIMMONS:**  That's exactly the way

17  it happened.  My shoulder width was the shoulder

18  length.  Because all I did was went to block the

19  blow.  That's all I went to do was block the

20  blow.  I did not intentionally shoot her.  I

21  would never want to do that.

22      **DEPUTY COMMISSIONER SMITH:**  You were

23  received by the Department of Corrections on

24  September 27, 1990.  Received here at CTF on

25  10/29/1996.  You have a classification score of

26  19, which is the lowest classification score

27  that a life inmate can attain.  Your last

26

1   hearing was held on September 21, 2004.   That

2   was your third subsequent hearing and you

3   received a one-year denial at that time.   You've

4   had a positive adjustment history.   You've had

5   two CDC 128(a)s.   The last one was back in

6   November of 1991 and that was for possession of

7   unused property.   And you've only had one CDC

8   115 and that was back in December of '93 and

9   that was for fighting.   You've taken a number of

10  programs.   You've been assigned to the PIA Wood

11  Products.

12          INMATE SIMMONS:   Yes sir.

13          DEPUTY COMMISSIONER SMITH:   Right?   Is

14  that your current assignment?

15          INMATE SIMMONS:   Yes sir.

16          DEPUTY COMMISSIONER SMITH:   And, I need

17  to find that over here.   Because you received

18  three 128 training certificates in that program.

19  And those certificates are in, all in December

20  '05.   And they're 12/15/05 and they're for,

21  they're in the finishing shop.   And they're for

22  MSDS?   What does MSDS stand for.

23          INMATE SIMMONS:   Material Safety Data

24  Sheet.

25          DEPUTY COMMISSIONER SMITH:   Okay.   And

26  for Lock Out and Tag Out, for General Safety,

27  for Back Safety, and for Ear, Eyes and Sound.

27

1          **INMATE SIMMONS:**  Yes sir.

2          **DEPUTY COMMISSIONER SMITH:**  And if I said

3    there were three, there are actually five.  You

4    completed Correctional Learning Network's

5    Postcards.

6          **INMATE SIMMONS:**  Yes sir.

7          **DEPUTY COMMISSIONER SMITH:**  And what's

8    that program?

9          **INMATE SIMMONS:**  It was on history and

10   geographical things and states and countries.

11         **DEPUTY COMMISSIONER SMITH:**  And there's a

12   chrono for your attendance with Dr. Zika, Z-I-K-

13   A, in Stress Management, a chrono for that

14   September of '04.  And also a therapy session

15   with the same doctor for anger management and

16   that's dated October of '04.  You completed your

17   GED in May of '94.  And you've been active in NA

18   and there are chronos through December of '04.

19   You still current in that program?

20         **INMATE SIMMONS:**  Yes sir.  It's just the

21   new quarter isn't over with that's why I don't

22   got an updated chrono.

23         **DEPUTY COMMISSIONER SMITH:**  Well the last

24   chrono was December '04.

25         **INMATE SIMMONS:**  Okay.

26         **ATTORNEY TARDIFF:**  You have one more

27   recent than that?  '04, it's '06 now.

28

1      **INMATE SIMMONS:** No, well I was in North

2   Facility for awhile so we got locked down.

3   Actually, let's see '04, I should have an '06

4   one I got.  (Inaudible) hang on.

5      **DEPUTY COMMISSIONER SMITH:** But you're

6   still currently involved.  I'll certainly take

7   your word for that.

8      **INMATE SIMMONS:** Yes sir, okay.

9      **DEPUTY COMMISSIONER SMITH:** Next, if you

10   received a parole date would you continue to

11   participate in that program in the community?

12      **INMATE SIMMONS:** Yes sir.  Yes sir.

13      **DEPUTY COMMISSIONER SMITH:** And why?

14      **INMATE SIMMONS:** Why?  Because it's an

15   ongoing thing that a person like me needs.  And

16   it's, it helps.  Plus I can get help too myself

17   on my experiences that I've had.

18      **DEPUTY COMMISSIONER SMITH:** Have you made

19   contact with AA groups in the community about

20   when they meet and where and for sponsors,

21   things like that.

22      **INMATE SIMMONS:** No, but I got a list of

23   where they're at.  I wrote and got a list or

24   something.

25      **DEPUTY COMMISSIONER SMITH:** Okay.  Okay,

26   so you have made contact with --

27      **INMATE SIMMONS:** Yeah, I made contact, I

29

1  write to, I mean the parole release and I get
2  all the addresses and I keep all that.

3        DEPUTY COMMISSIONER SMITH:  Okay.  And
4  there were two laudatory chronos that were
5  provided to me.  One is dated March 22nd of this
6  year, it's from the PIA superintendent.  And
7  that indicates that you voluntarily participated
8  in a three hour video instruction and discussion
9  of the issues related to successfully re-
10  engaging into society.  And it's, the name of
11  the program is The Inmate Employability Program.
12  And then there's also a laudatory dated March
13  23rd, '06.  Again from the PIA individual who
14  also says that you voluntarily participated in
15  three hours of inmate employment, Employability
16  Program.  Are those different programs?  Are
17  these --

18        INMATE SIMMONS:  Well they're two
19  different videos and --

20        DEPUTY COMMISSIONER SMITH:  Okay, so they
21  are two separate programs that you did basically
22  back-to-back.

23        INMATE SIMMONS:  Yes sir.  Yes sir.

24        DEPUTY COMMISSIONER SMITH:  Okay.  And
25  the second one has to do with issues relating to
26  anger management, reducing emotional levels of
27  anger and identifying those fears and things

30

1  like that.  Before I go to your parole plans,

2  are there any other activities that you've been

3  involved in since your last hearing in 2004 that

4  I haven't addressed that we should be aware of?

5          **INMATE SIMMONS:**  The meditation.

6        **ATTORNEY TARDIFF:**  Yeah the letter.

7          **INMATE SIMMONS:**  The letter.

8          **DEPUTY COMMISSIONER SMITH:**  Okay.

9          **INMATE SIMMONS:**  The communication, I've

10 been doing that for three months.

11         **DEPUTY COMMISSIONER SMITH:**  Okay, I

12 didn't realize that this was something that

13 referenced a program you were in or was a letter

14 of support.  I was going to get to it, I just

15 wasn't sure when.  This is a letter dated April

16 4, 2006 from the Buddhist Chaplaincy.  It's

17 signed by the coordinating teacher.  And it says

18 that although attendance at the Buddhist

19 Meditation Studies Program does not entitle an

20 individual to a laudatory chrono the fact is

21 that you've been attending the program for about

22 three months.  And that the people involved in

23 the program would like to acknowledge your

24 commitment with this letter of commendation.

25 And the purpose of the program is to teach

26 traditional Buddhist meditation and ethical

27 practices.  Weekly instruction includes guided

1    meditation practice, lectures on that practice

2    and on Buddhist principles for living an ethical

3    and moral life.  Anything else we should be

4    aware of?

5         **INMATE SIMMONS:**  That should be it sir.

6         **DEPUTY COMMISSIONER SMITH:**  Okay.  If

7    anything else comes to mind, please let us know.

8         **INMATE SIMMONS:**  Okay.

9         **DEPUTY COMMISSIONER SMITH:**  Because we

10   want to make sure that we're aware of every

11   positive thing that you've been doing.

12        **INMATE SIMMONS:**  Okay.

13        **DEPUTY COMMISSIONER SMITH:**  Okay, and

14   you've got, you know, a fairly substantial list.

15   You know, with some people it's fairly easy,

16   there are only a couple of things.  With you

17   there's quite a lot of things so I want to make

18   sure that we haven't overlooked anything.  Going

19   to the Board Report that's dated September 2005.

20   It indicates that your parole plans would

21   include residing with your daughter, Amanda

22   Thompson, in Paso Robles.

23        **INMATE SIMMONS:**  Yes sir.

24        **DEPUTY COMMISSIONER SMITH:**  And as an

25   alternate, residing with Tina and Larry Miles,

26   mother-in-law and father-in-law in Paso Robles.

27        **INMATE SIMMONS:**  Yes sir.

32

1         **DEPUTY COMMISSIONER SMITH:**  And in San

2    Bernardino County you've also been accepted by

3    the Set Free Christian Fellowship, which is in

4    San Bernardino, California.

5         **INMATE SIMMONS:**  Yes.

6         **DEPUTY COMMISSIONER SMITH:**  And there are

7    a number of letters, you know, all of which I'll

8    address shortly.  And with regard to employment,

9    indicates that the Set Free Christian Fellowship

10   in San Bernardino basically offers a 60 day

11   program at their facility.  And that you would

12   then have the option of employment, full-time

13   ministry or job training with them.  And for San

14   Luis Obispo County another option would be

15   attending Project Amend in San Luis Obispo,

16   California.  And I keep looking over my shoulder

17   to make sure that there's plenty of tape so I

18   don't get or you don't get interrupted in the

19   middle.  I have a letter from Project Amend.

20   It's dated April 2005, written by Sam Duffy, D-

21   U-F-F-Y, Office Manager.  Indicates that you've

22   been accepted in the Project Amend, welcome to

23   stay there as long as is necessary, although

24   it's recommended that you stay at least for six

25   months.  And their fee is $850 dollars a month

26   at the main facility and $550 dollars at the

27   three-quarter houses.  And the fees include

33

1   meals, transportation, program, modalities such

2   as AA, NA and other parole aftercare.   And

3   that's in San Luis Obispo.   There's a letter

4   dated June of 2005 from the Set Free Christian

5   Fellowship signed by Raymond Slocum, S-O-L, I'm

6   sorry, S-L-O-C-U-M, Senior Pastor.   And that

7   indicates that you'll be accepted into the

8   discipleship program.   And that should you be

9   released to the Set Free Christian Fellowship

10  Program in San Bernardino they ask that they be

11  notified by you in writing so that they can have

12  the necessary information in their files.   The

13  program is a 24-hour, seven-day-a-week,

14  supervised residential program.   There's also a

15  letter from an Arthur Pinner, P-I-N-N-E-R,

16  Pinner?

17         INMATE SIMMONS: ` Pinner.

18         DEPUTY COMMISSIONER SMITH:  Pinner, who

19  is the vice-president of operations.   It's dated

20  September 2005.   And he's with Bright Horizon

21  Metals.   And he's in Sumner, Washington.

22         INMATE SIMMONS:  Yes sir.

23         DEPUTY COMMISSIONER SMITH:   It indicates

24  that he has a job waiting for you anytime you

25  want it and he would be proud to have you

26  working for him.   But you don't have any plans

27  on going to Washington?

34

1          **INMATE SIMMONS:**  No sir, but --

2          **DEPUTY COMMISSIONER SMITH:**  Okay.

3          **INMATE SIMMONS:**  But he's supporting me.

4     He's been supporting me in case I didn't know

5     any, if I wanted to make my -- He said I could

6     go up there if I wanted to be with my family.

7          **DEPUTY COMMISSIONER SMITH:**  Okay.  We

8     were presented with a number of letters.  A

9     letter from Tina and Larry Mills.  And this

10    letter indicates that they'd like to have you

11    paroled.  And that they would like you to come

12    home, both the family and the children need you.

13    Where do they live?

14         **INMATE SIMMONS:**  Paso Robles.

15         **DEPUTY COMMISSIONER SMITH:**  Paso Robles?

16         **INMATE SIMMONS:**  Yes.

17         **DEPUTY COMMISSIONER SMITH:**  A letter from

18    Amanda Thompson, your daughter.  And there's

19    also another letter that I'm going to assume

20    isn't as recent in the Board Packet.  But she,

21    of course says that she's your daughter.  She'd

22    love to have you come and live at her residence.

23    She knows that you've been doing well since

24    you've been in the institution.  She loves you

25    very much.  Hopes that a parole date will be

26    granted so that you can come home to your

27    family.  A letter from, is it Gina or Jean

1  Mills?

2          **INMATE SIMMONS:**  Gina Mills.

3          **DEPUTY COMMISSIONER SMITH:**  Gina Mills.

4          **INMATE SIMMONS:**  My sister.

5          **DEPUTY COMMISSIONER SMITH:**  It's dated

6   April 2006.  Indicates that she supports you one

7   hundred percent.  That she would help in any way

8   that she can.  And that she feels that you've

9   done enough time and needs to be with your

10  children and the family.  And that she will help

11  you in any way that she can.  Where does she

12  reside?

13          **INMATE SIMMONS:**  Paso Robles.

14          **DEPUTY COMMISSIONER SMITH:**  Paso Robles

15  as well.  So most of the family lives in Paso

16  Robles?

17          **INMATE SIMMONS:**  Yes.

18          **DEPUTY COMMISSIONER SMITH:**  Another

19  letter from Michael Simmons Jr.  And since he's

20  here I'll let the record note that we have the

21  letter on file but since you're going to be

22  speaking I'll let you speak.  In place of the

23  letter you're speaking would be better.  A

24  letter from Lan (phonetic) Anguiano, and I'm

25  sure I have not pronounced that right, A-N-G-U-

26  I-A-N-O.  Operates Commercial Glass in San Luis

27  Obispo.  Indicates that he has the ability to

36

1   hire you.  And offered you full employment with
2   him in the event that you're granted parole.  A
3   letter from John Schauerman, S-C-H-A-U-E-R-M-A-
4   N, Dual Improvements Handyman Service in San
5   Luis Obispo.  And this letter states that as a
6   supervisor and foreperson in charge of hiring
7   that he has a full-time position for you as a
8   handyman with the company.  And that any
9   additional training that you would require would
10  be provided to you on the job.  Another letter
11  from Julie Giulivo, G-I-U-L-I-V-O, owner and
12  operator of American Yard, Yard Maintenance in
13  Paso Robles.  Indicating that there's a position
14  available for you in landscaping.  And lastly a
15  letter from Anthony Charnley, C-H-A-R-N-L-E-Y,
16  in Paso Robles from The Tire Store indicating
17  that if there's a need to fill a position at the
18  time you're released that they would gladly
19  consider you for a position when you're
20  available.  Quite a lot of positive letters.  We
21  also send out what are known as 3042 notices.
22  Those are letters that go out to the various
23  criminal justice agencies that were involved in
24  your commitment offense.  We didn't receive any
25  letters in response.  However we do have
26  Mr. Wilson from the San Bernardino County
27  District Attorney's Office and he will be

1   participating in the hearing in just a short

2   time.  We've reviewed the most current

3   psychological evaluation.  It's dated June 2003,

4   prepared by Dr. Howlin (phonetic).  And since

5   it's primarily an addendum to the prior

6   psychological evaluation that we've used for the

7   last report I'm going to address just what I

8   consider to be some of the key points.  And that

9   if you or counsel want to add anything else to

10  the record based on the evaluation or have any

11  comments or questions to add you certainly have

12  that opportunity.  On the first page the doctor

13  writes that you had a complete and comprehensive

14  psychological evaluation completed in November

15  of 2000 by Dr. Carswell, C-A-R-S-W-E-L-L.

16  However the Board requested additional

17  information that would address your violence

18  potential in the community if paroled as well as

19  exploring the commitment offense and insight

20  gained.  Under Diagnostic Impressions, the

21  doctor writes that under Axis I there's poly-

22  substance abuse dependence that's in

23  institutional remission.  Under Axis II there

24  are no personality disorders and under Axis III

25  that you have asthma and bronchitis by history.

26  Under Axis IV he adds stress as a result of

27  long-term incarceration and that's a standard

38

```
1    diagnosis for all life inmates.  And you have a

2    GAF score of 75.  That GAF score is based on a

3    scale of zero to 100 so 75 is relatively high.

4    And the doctor concludes that the prognosis for

5    -- is positive for you being able to maintain

6    your current mental status in the community upon

7    parole.  Under Assessment of Dangerousness on

8    page three the doctor writes that he agrees with

9    the past evaluation that was done in 2000

10   regarding your violence potential estimation.

11   And concludes that your violence potential

12   within a controlled setting is estimated to be

13   well below average compared with the Level II

14   inmate population.  That if you were released to

15   the community your violence potential would be

16   estimated to be no more than that of the average

17   citizen in the community.  And the doctor does

18   note as a possible risk factor, which could be a

19   precursor to violence, would be that you'd

20   return to the abuse of illicit drugs or use of

21   alcohol.  And should you choose to abuse those

22   substances, again, your violence potential would

23   be considered higher than the average citizen in

24   the community.  So overall it is certainly a

25   very positive evaluation report.  Any comments

26   or additions that either you or counsel would

27   like to make?
```

1          **ATTORNEY TARDIFF:**  Not at this time.

2          **INMATE SIMMONS:**  No sir.

3          **DEPUTY COMMISSIONER SMITH:**  All right.

4     And before we go on I'm going to turn the tapes

5     over.

6               (The tape was turned over.)

7          **DEPUTY COMMISSIONER SMITH:**  Commissioner.

8          **PRESIDING COMMISSIONER DAVIS:**  I'm going

9     to go back to the date of the offense again.

10    After the accident occurred and the gun was

11    removed from your hand however that happened.

12    Did you remember, do you remember saying

13    anything or throwing anything?

14         **INMATE SIMMONS:**  No sir.

15         **PRESIDING COMMISSIONER DAVIS:**  Do you

16    know how it would be that there was a witness

17    who heard you making a statement about having

18    killed the bitch.

19         **INMATE SIMMONS:**  Yeah, I just remember, I

20    don't remember me saying it.  I mean I probably

21    said it during the heat of the argument during

22    that time but we were arguing all morning.  I

23    might have said it during that time.  But I

24    didn't intentionally want to do this.

25         **PRESIDING COMMISSIONER DAVIS:**  But you

26    don't have any specific recollection of any

27    statements one way or the other?

1          INMATE SIMMONS:  No sir.  No sir.

2          PRESIDING COMMISSIONER DAVIS:  All right.

3     Do you have any further questions?

4          DEPUTY COMMISSIONER SMITH:  No I don't,

5     thank you.

6          PRESIDING COMMISSIONER DAVIS:  Does the

7     District Attorney have any questions?

8          DEPUTY DISTRICT ATTORNEY WILSON:  Just a

9     couple of questions Commissioner.  Following up

10    on that, the question regarding the argument.

11    If the Commissioner could inquire what, how did

12    the inmate feel towards the victim?  What was

13    his level, was he angry or what was his

14    emotional state?

15         PRESIDING COMMISSIONER DAVIS:  Do you

16    understand the question?

17         INMATE SIMMONS:  Yes sir.  I was upset

18    but I wasn't angry enough to hurt her.  I was

19    just upset that she was destroying everything

20    but it didn't matter.  You know, it could all be

21    fixed.  But then she said she was going to leave

22    so I was just trying to stay away from her and

23    avoid her.  That's all.

24         PRESIDING COMMISSIONER DAVIS:  Okay.

25         DEPUTY DISTRICT ATTORNEY WILSON:

26    Commissioner, Commissioner Smith queried the

27    inmate regarding the movements right before the

41

1   shooting occurred, the position of the gun, the

2   height of the victim and the inmate.  If I

3   remember correctly the inmate indicated that the

4   gun went of as the victim, as he blocked the

5   victim from striking him.  Is that correct?

6          PRESIDING COMMISSIONER DAVIS:  Is that

7   your recollection today?

8          INMATE SIMMONS:  Yes sir.

9          DEPUTY DISTRICT ATTORNEY WILSON:  I'm

10  looking at the appellate court discussion on

11  page four under the defense heading.  And it

12  talks about the defense which the inmate

13  proffered at trial.  Specifically the last

14  sentence under that paragraph defense, the

15  defendant testified, as the defendant was

16  unloading the gun he testified that the victim

17  made a motion as if to strike him.  He flinched

18  and the gun went off.  I bring this up because

19  that's in contrast to what the inmate told

20  Commissioner Smith regarding blocking the blow.

21  Here we're talking a flinch. If that could be

22  clarified.

23         PRESIDING COMMISSIONER DAVIS:  Do you

24  understand the question?

25         INMATE SIMMONS:  Yes sir.

26         PRESIDING COMMISSIONER DAVIS:  Okay.

27         INMATE SIMMONS:  It was the blocking the

1  blow.  It was a flinch, it was a reaction that I
2  had.  That's all it was, it was a reaction.  I
3  don't remember if I had contact with her or not.
4  All I know is that after it happened I looked on
5  the floor.  I thought it hit -- The bullet when
6  it went off hit the ceiling.  So I looked on the
7  ground and she was on the ground.  And that's
8  what I remember about the way it happened.  I
9  mean I don't remember if it was contact, all I
10 know is that I was defending myself from a blow.
11      **DEPUTY DISTRICT ATTORNEY WILSON:**  Nothing
12 further.
13      **PRESIDING COMMISSIONER DAVIS:**  Counsel.
14      **ATTORNEY TARDIFF:**  I have nothing.
15      **PRESIDING COMMISSIONER DAVIS:**  Closing
16 statements from the District Attorney.
17      **DEPUTY DISTRICT ATTORNEY WILSON:**  Thank
18 you Commissioners.  Commissioners on this one,
19 this is one of those cases that it's either
20 black or white in the sense that the inmate's
21 position before this panel is that the victim
22 was shot accidentally.  And when you use the
23 term accidentally it's almost an unavoidable
24 consequence.  What this inmate was convicted of
25 was second degree murder, and that's an
26 intentional act.  So there's no middle ground
27 here on the way this inmate is setting up the

43

1    story.   And I think as Commissioner Smith

2    pointed out, that the inmate's story here is

3    really not tenable when related to the facts.

4    In the autopsy report, the trajectory and what

5    happened.   This is an inmate who is basically

6    arguing with his common law for an entire day.

7    She's accused him of using narcotics the night

8    before.   His car is not working.   I'm sure the

9    tension level is up.   And for whatever reason in

10   that garage he murdered the victim.   This wasn't

11   an accident.   And he's downplaying that.   He's

12   minimizing that.   And that's important because

13   that version that he's told, all his support has

14   heard that.   All the people that have written

15   letters on his behalf and are supporting him.

16   The psychologist, the 2003 and 2000 version,

17   psychological report were based upon that self-

18   serving statement.   The risk assessment is based

19   upon the accident version.   And that version is

20   not what's before this panel.   The version is

21   this inmate intentionally killed the victim.

22   And again, we've been through insight many

23   times.   And in this case, why did he do that?

24   Okay, if he's talking the accident we don't even

25   get to that.   We don't know what's inside his

26   mind.   We don't know why he snapped or why he

27   killed.   And until he can sit and tell this

44

1   panel, hey, I murdered, I intentionally killed

2   the victim because, and put that version out

3   there.  And that's when we can start getting

4   into has he adjusted, is he a threat.

5.  Commissioner Davis brought up the statement and

6   I think what's important to note in the

7   statement he brought up about the witness

8   hearing is the witness heard, quote, I'm going

9   to kill the fucking bitch, close quote prior to

10  the shooting.  Thirty seconds before that shot

11  rang out she heard, I'm going to kill the

12  fucking bitch.  Now that in context with the

13  autopsy report of the argument that's going on

14  with the fight all together, that doesn't sound

15  like an accident.  And we're not really here to

16  litigate that because the jury returned that

17  verdict.  And we've got an individual who is on

18  probation and while on probation committed this

19  murder.  And he has not admitted it.  Until he

20  steps up and takes responsibility and shows

21  remorse, not for an accident, remorse for a

22  murder, takes that responsibility, makes amends

23  and makes adjustments in his lifestyle so it

24  won't happen again.  Until he does that he is an

25  unreasonable risk of danger to society.  And I

26  urge this Board to deny parole at this time and

27  find him unsuitable.

45

1          **PRESIDING COMMISSIONER DAVIS:**  Okay,

2    counsel.

3          **ATTORNEY TARDIFF:**  Thanks.  In terms of

4    Mr. Simmon's pre-incarceration history it is

5    supportive of release.  Apparently up until the

6    commitment offense and shortly before that, he

7    did have a stable social history.  And I think

8    he'll readily admit that they were having

9    problems at the time of the commitment offense.

10   He also had insignificant criminal history.  He

11   did have substance abuse issues but he was able

12   to maintain employment and support his family as

13   well.  In terms of the commitment offense itself

14   there are a couple of mitigating factors.  Once

15   again, his minimal criminal behavior or history.

16   And he admitted guilt early on.  I'd also like

17   to point out in the probation officer's report

18   on page four it states that although Mr. Simmons

19   must now pay for his offense, the probation

20   officer does not see him as a future threat to

21   society or criminally oriented.  And I think

22   that that is very significant because that was

23   at the time of the commitment offense.  It was

24   from an unbiased officer, probation officer.

25   And that was their view of Mr. Simmons at that

26   time.  Since that time he has not been

27   criminally oriented.  He has only one 115 in

46

1    '93.   It was reduced to an administrative 115

2    and that was thirteen years ago.   He's only had

3    two 128s.   And that was in, the last one was in

4    '91.   So he is not criminally oriented.   Also I

5    believe that this is a unique set of

6    circumstances that is extremely unlikely to

7    reoccur again thus reducing his level of

8    dangerousness even further.   Since he's been

9    incarcerated he has done well.   He has

10   educationally upgraded himself, received a GED

11   and participates in the continuing learning

12   network.   He has made himself marketable in

13   terms of employment, not only through vocations

14   but currently in PIA Wood Products and continues

15   to upgrade with training certificates in that

16   program.   Self-help, he has managed to get

17   himself into individual therapy, which is

18   extremely difficult to do.   In fact almost

19   impossible, but he was able to do it, to deal

20   with the substance abuse and anger management as

21   well as stress.   He has continuously

22   participated in NA when he has been able to do

23   so for a number of years.   I think it's going on

24   something like ten years that he's been doing

25   that.   And he also is now involved in the

26   meditation program due to the fact that there

27   isn't a lot of other self-help out there at this

1    time.  But he has managed to find that program.

2    He's also participated in self-help parole

3    programs to make the transition from prison to

4    the free community easier.  His work reports are

5    above average to exceptional.  His last three

6    psych evals are supportive of release, starting

7    in 1994, it states that his violent potential is

8    estimated to be below average for the Level IV

9    inmates.  And at that time they didn't assess

10   violent potential with the free community.  It

11   further states he would be expected to maintain

12   that outside the controlled setting based on

13   past behavior in that he does not have an

14   extensive history of violence or antisocial

15   behavior.  In 2000, and I believe some of that

16   has been read into the record, but it states

17   that his judgement appears to be sound.  His

18   violent potential is no more than the average

19   citizen.  His prognosis is positive in that he

20   accepts responsibility for the victim's death.

21   The risk factors is substance abuse, but I

22   submit that somebody that has, has had a

23   substance abuse problem that never goes away.

24   It's always a potential there.  And that's why

25   they have the 12 step programs, and continuous

26   participation in that to insure that that risk

27   factor does not come into play.  The '03 psych

48

1    eval stated he has good insight, good judgement,

2    there's no mental health diagnosis or disorders.

3    His prognosis is positive.  And his violent

4    potential is the same as the average citizen

5    base upon his minimal criminal history, his lack

6    of serious 115s and his psychological gains.

7    His parole plans are excellent.  He has several

8    alternative housing, job offers.  He has

9    included substance abuse treatment programs in

10   his parole plans and I submit that they are

11   excellent parole plans.  In terms of the bottom

12   line, does Mr. Simmons represent a risk should

13   he be released?  I don't think that he does

14   based on the fact that he has had no propensity

15   to violence.  He does not have any anti-social

16   behavior in that this commitment offense with

17   the mitigating factors and the fact that it's

18   unlikely to reoccur again makes him suitable for

19   parole, thank you.

20        **DEPUTY COMMISSIONER SMITH:**  Thank you

21   counsel.

22        **PRESIDING COMMISSIONER DAVIS:**  Thank you

23   counsel.  Mr. Simmons it's now your opportunity

24   to address the panel directly as to why you

25   believe that you're suitable for parole.

26        **INMATE SIMMONS:**  I feel that I've done

27   everything that I could possibly do.  I made

49

1   amends with everybody.  I've done all my self-

2   help.  I've educated myself.  And I understand

3   that my lifestyle that I lived then was

4   reckless.  I understand that.  And I learned

5   from that.  And I had to learn from the hard way

6   but I did learn from it.  And I feel that I can

7   be successful, be a father to my children, be a

8   productive member in society by participating in

9   all these programs that helped me through these

10  times.  And that is the good supportive family

11  that I have that I'll be successful.  That's it

12  right now.

13          PRESIDING COMMISSIONER DAVIS:  Okay.  All

14  right, thank you.

15          DEPUTY COMMISSIONER SMITH:  Thank you.

16          INMATE SIMMONS:  I'm nervous.

17          DEPUTY COMMISSIONER SMITH:  Thank you.

18  You did very well.

19          PRESIDING COMMISSIONER DAVIS:  That's all

20  right.  I know it's been a long day.  And I know

21  that these are unusual and very difficult

22  circumstances so we appreciate your hanging in

23  there.  It's now your turn.  Who will speak

24  first?  If you'll do me -- Go ahead, just take a

25  second.  If you'll do me a favor please, because

26  it's been a while since the transcriber would

27  have heard your name.  If you'll give us your

1  name, first and last name, and spell your last

2  name again for us, please.

3       MS. MILLS:  My name is Tina Mills, M-I-L-

4  L-S, and I'm Corina's mother.  What do we say?

5  When is enough?  Nobody knows when is enough.

6  There's a death, it's never going to go away,

7  it's always going to be there.  I don't care if

8  it was on purpose or accident or what, it's

9  still going to be there and it's always going to

10  be with us and he knows this.  But I just think

11  it is enough.  I think it's time he can come

12  home and be with his children who need him so

13  much.  In this day and age they need their dad.

14  You know, he's not a bad person.  He calls them

15  a lot and he'll talk to them on the phone.  And

16  I'll say, I'm having a problem with him doing

17  this and he gets on these kids and tells them.

18  And they toe the line.  And he's in here, they

19  know he can't touch them.  But, you know, he has

20  good sense and I don't think he's a bad person.

21  My husband and I both think it's just enough.

22  We just -- It's never going to come to an end.

23  Every year we come back, we come back and come

24  back, the same thing is over and over and we've

25  heard it all.  There was a death.   There was a

26  death and she's not coming back.  And if I could

27  turn the tables, I'd have her.  Believe me, I'd

51

1    take my daughter over him.  But she's not coming
2    back and we just need this to stop.  We just
3    think Mike can come home.  We have plenty of
4    people that want jobs.  And I told them the
5    whole story.  I haven't told them, he's such a
6    good person, blah-blah this.  I've told them the
7    story.  I've told them, San Bernardino said it
8    was no accident, that he did it on purpose.  We
9    believe what we want to believe.  We just want
10   him to come home.  Can you offer him a job.
11   This is what kind of a person he is.  And
12   they're all willing to help someone that wants
13   to help himself.  Being in here is not helping
14   him I don't think.  It's just -- It's just time
15   I think.  I think he needs to come home and it's
16   up to you, thank you.
17          **PRESIDING COMMISSIONER DAVIS:**  Thank you.
18          **DEPUTY COMMISSIONER SMITH:**  Thank you.
19          **MR. SIMMONS:**  I'm Michael Simmons, S-I-M-
20   M-O-N-S.  I'm the son of Michael Simmons.  I
21   don't know how to put it all into words.  It's
22   time for him to come home, you know.  Every time
23   someone that someone comes in here, you're ready
24   for him to come home.  But I haven't had my
25   father around since -- for 17 years and I'm
26   going to be 19 years old.  And I would say this
27   is the most hardest time in my life and I really

52

1   need my father around.  My sister does too.

2   Just, you know, we lost our mother already.  And

3   yes, he knows it's somewhat his fault in a way,

4   but it's not because he loved her with life

5   itself and everything.  I just know he wouldn't

6   do that on purpose and he needs to come home and

7   be able to take care of us and be able to start

8   the family that we never have been, got to have.

9   I never got to have my father around.  Never got

10  to just be able to wake up and go hang out and

11  things like that.  We need that, you know.  It's

12  not as easy as anybody thinks to grow up without

13  a mom or a dad and not to be able to, you know,

14  just do anything (indiscernible).  Go wait an

15  hour or two to go wait in line just to go see

16  him and all these bars around and these police.

17  It's just not something that's fun or something

18  that I would want anybody to have to ever do or

19  something for anybody to go through.  But I am

20  and it's made me the person I am today.  And I

21  thank him in a way because I look up to him no

22  matter what.  And he gives me my strength and he

23  keeps me going.  He's just the best dad.  Even

24  though it's kind of weird to say because he

25  hasn't been around but I know he could be the

26  best dad in the world if he was around and I

27  would love for you guys to be able to let him

53

1   come home.

2        **DEPUTY COMMISSIONER SMITH:**  Thank you

3   very much.

4        **MR. SIMMONS:**  Thank you.

5        **PRESIDING COMMISSIONER DAVIS:**  All right,

6   thank you.  We will recess to deliberate.

7                    **R E C E S S**

8                      --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

54

1        CALIFORNIA BOARD OF PAROLE HEARINGS

2                  D E C I S I O N

3        DEPUTY COMMISSIONER SMITH:  We're back on

4   the record.  Everyone previously identified is

5   back in the room with the exception of the

6   deputy district attorney from San Bernardino

7   County who had to leave early to catch a flight.

8        PRESIDING COMMISSIONER DAVIS:  This is

9   the matter of Michael Simmons.  The CDC number

10  is E-70748.  The panel has reviewed all the

11  information received from the public and relied

12  on the following circumstances in concluding

13  that the prisoner is not suitable for parole and

14  would pose an unreasonable risk of danger to

15  society or a threat to public safety if released

16  from prison.  And specifically that is that the

17  motive was inexplicable in relation to the

18  offense.  This was a tumultuous relationship.

19  The combination of guns and drugs, and those

20  loaded weapons, provided a -- proved to be fatal

21  to the victim.  You told the panel that you have

22  learned from this situation but the victim paid

23  the ultimate bill for that education.  Over the

24  last 17 years the facts of what happened on that

25  day have become less clear to those involved but

26  the record remains the same.  That this is a

27  MICHAEL SIMMONS E-70748 DECISION PAGE 1 04/05/06

55

1    tragic and senseless crime.  We also find that

2    you failed to profit from society's previous

3    attempts to correct your criminality in that you

4    were previously on adult probation for having a

5    loaded firearm.  We do not that your record

6    while in custody has been exemplary in that you

7    have only had two 128(a) counseling chronos, the

8    latest one being in 1991.  And did you say two

9    115s?

10          **DEPUTY COMMISSIONER SMITH:**  One.

11          **ATTORNEY TARDIFF:**  One.

12          **PRESIDING COMMISSIONER DAVIS:**  One 115,

13    the last or that one being in December of 1993.

14    We also note that the psychiatric report dated

15    June of 2003 by Dr. Howlin was favorable, and

16    that you have good parole plans in that you have

17    a place to live with your daughter in Paso

18    Robles or with the Set Free Christian Fellowship

19    or with Project Amend.  And that you also have

20    positive employment plans with American Yards

21    Landscape and a possibility of employment with

22    the Tire Store in Paso Robles.  With regard to

23    the 3042 notices we do note that the District

24    Attorney for San Bernardino County was here in

25    person and does oppose parole at this time.

26    Nevertheless you are to be commended for a

27    **MICHAEL SIMMONS E-70748 DECISION PAGE 2 04/05/06**

56

1  variety of programs.  You are involved in the

2  PIA wood products.  You have five 128(b)

3  training certificate chronos.  You're involved

4  in the Correctional Network Postcards, involved

5  in stress management, anger management.  You

6  completed your GED.  You're active in NA.  You

7  have three laudatory chronos for the video

8  discussion on re-engaging in society.  You have

9  a laudatory chrono for volunteering in three

10 hours of inmate employability program and you

11 are currently involved in the meditation program

12 with the Buddhist chaplain.  And that your work

13 reports are above average to exceptional.  With

14 regard to recommendations.  The panel recommends

15 that you remain disciplinary-free.  That you

16 avail yourself and participate as available in

17 self-help and that you continue to earn positive

18 chronos.  This is a one year denial.

19 Commissioner Smith, do you have anything that

20 you would like to add?

21     **DEPUTY COMMISSIONER SMITH:**  Certainly

22 Mr. Simmons you are doing very well.  You're

23 moving closer to the door with your programming.

24 But the commitment offense was senseless,

25 irregardless of which telling of the how it

26 happened is accurate.  It was unnecessary to

27 **MICHAEL SIMMONS E-70748 DECISION PAGE 3 04/05/06**

57

1   have happened at all.  And that's simply, in my

2   opinion, going to take some time.  I wish you

3   well, continue on the path, good luck.

4          **PRESIDING COMMISSIONER DAVIS:**  I think

5   the last Commissioner also stated that, you

6   know, sometimes when you have these kinds of

7   things it may be seen as backsliding and it's

8   not.  You just need to continue on the path that

9   you're on.  And I know it's difficult.  I can

10   only imagine.  But you are doing things well.

11   And by staying disciplinary-free and doing the

12   things you're doing you will progress and that's

13   what you need to do.  I also wish you the best

14   of luck.  With that we are adjourned.

15                 --oOo--

16

17

18

19

20

21

22

23   **PAROLE DENIED ONE YEAR**

24   **THIS DECISION WILL BE FINAL ON:  08/03/2006**

25   **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **MICHAEL SIMMONS E-70748 DECISION PAGE 4 04/05/06**

58

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, RAMONA COTA, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 57, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of MICHAEL SIMMONS, CDC NO. E-70748, on APRIL 5, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated April 24, 2006, at Sacramento County, California.

RAMONA COTA
TRANSCRIBER
**PETERS SHORTHAND REPORTING**